Is Thomas M. Robbins appearing for Cathay Bank's Successor in Interest through Merger to General Bank, which was the collecting bank in this side? We were informed by the clerk that we needed to split our time with the appellant. I don't know that that makes sense, and I don't know that we are truly aligned with any party in this case. All I have is about five minutes of argument anyway. If I may suggest that nobody get dinged for my five minutes, and I'll just do it separately after Bank of Asia completes its argument. You're more aligned with Bank of Asia than you are with Red Chamber anyway, aren't you? That is correct, but I still have my own five minutes of something to say. But whatever pleases the Court, it's just we need to know, obviously, before we begin. We'll give Bank of Asia 15 minutes, and we'll give General Bank's Successor five minutes. Thank you, Your Honor. Counsel. Good morning, Your Honor. William Thompson representing Defendant Appellant, Red Chamber Company. May it please the Court. Under the summary judgment standard, this case can be easily and swiftly resolved and sent back for trial on the merits based on a few simple facts. The district court correctly found that Red Chamber has a valid defense. Consequently, unless Bank of Asia demonstrated that a reasonable jury must necessarily find that it's a holder in due course, then a trial on the merits is required. That's to say that... That all sounds right to me so far, but I didn't see why Bank of Asia wasn't a holder in due course. Let me tell you what I'm thinking so you can educate me if I've got it wrong. It looks to me like Red Chamber educated General Bank on the fact that it wasn't paying the full amount of the bills of exchange. General Bank knew it. But General Bank's only responsibility is as a collecting bank to get the money and send it to Bank of Asia. As far as the deal that Red Chamber had with the fish exporter in Thailand, I don't see where that's any of Bank of Asia's concern as long as the bills of exchange are being paid in full each time, which they were. To me, it seemed analogous to if I have a kid at college and he gets an apartment, and I tell him, well, you're going to pay $100 a month of the rent out of your summer earnings, and I'll pay the rest of the rent on your apartment. The landlord is indifferent as long as he gets all the money, and the landlord is just like Bank of Asia. If I were to have a fight with my kid in college and quit sending the money for the rest of the rent, then the landlord could kick my kid out if he couldn't come up with the whole rent. No problem, and the landlord is not responsible for whatever the deal is between me and my kid. It seemed to me that Bank of Asia was in that position. As long as they get all the money, they don't care. It's fine. The bill of exchange is being paid in full, and they don't need to know the deal. And once they don't get all the money, they can take action against Red Chamber on the bills of exchange, and the deal is still none of their concern because they were never a party to it, never knew it. Well, Your Honor, there are a couple of responses to that. First, on the agency issue, I think a reasonable prior effect could clearly be. Why? The responsibilities of a collecting bank are pretty clear and pretty limited. I don't see how a reasonable prior effect could treat them as a general agent. Well, whether or not they're a general agent, Your Honor, certainly for purposes of this transaction, we think the record is clear that General Bank was Bank of Asia's agent. I don't take Your Honor to be questioning that, at least at this juncture. Collecting agent. Collecting agent. But on this particular record, where we have evidence that, for example, Bank of Asia affirmatively directed General Bank to inquire of Red Chamber why Red Chamber is not paying the face value of the bills of exchange, where we have evidence that General Bank, in fact, inquired why Red Chamber was not paying the face value of the bills of exchange, where we have record evidence that Bank of Asia directed General Bank to communicate with Red Chamber on behalf of Bank of Asia, we think that a reasonable prior effect could easily conclude that for purposes of these transactions, General Bank was acting as Bank of Asia's agent and that the communication of the consignment agreement defense fell well within the agency that was established by the conduct of these parties in this case. Let's see. Excuse me. Go ahead, Judge. The evidence is Bank of Asia told General to ask Red Chamber why Red Chamber wasn't paying the full amount, and what was the other thing that you said? That was found at excerpts of record, page 407, and that Bank of Asia told, I'm sorry, that General Bank, in fact, communicated with Red Chamber about why Red Chamber was not paying the face value of the bills of exchange, and that Bank of Asia told General Bank to communicate with Red Chamber on behalf of Bank of Asia. One can find one example of that at excerpts of record 405. All this is aside from the presumption of agency under the California Commercial Code, which the court below declined to apply in this case. So we think that on that factual record, a reasonable prior effect could clearly find that Bank of Asia, I'm sorry, that General Bank's knowledge of the consignment agreement defense fell within the agency of these parties. As a matter of fact, there's no question the materiality of the communication that Red Chamber had with General Bank on this topic. Bank of Asia, in its reply brief to General Bank in this very case, makes it very clear that they would like to have known that this defense existed. If, in fact, General Bank knew it, which the record shows, at least for purposes of summary judgment, Red Chamber did inform General Bank. One thing I've never understood about this case is how a parole evidence can come in to flatly contradict the payment term of a negotiable instrument. Well, Your Honor, first I'd like to make clear that the parole evidence issue is completely separate from the holder-in-due-course issue, and what Bank of Asia is contending is that as between O.M. Foods, the maker of the note, and Red Chamber, that Red Chamber would be prohibited from saying in response to an attempt by O.M. Foods to enforce the bills of exchange. Wait a minute. We have a consignment agreement that limits our liability under the notes to amounts that are set by the Erner-Berry Shrimp Index Project. If I write you a check payable to Mr. Thompson in the amount of $500, can I come back later and say we really had a side agreement that it was only $300? The check shouldn't be honored, paid according to its tenor? Under the consignment agreement, there's no necessary contradiction between the face amount of the bill of exchange and the amount of the Erner-Berry price for the shrimp. And, in fact, it's undisputed that in this case Red Chamber paid the face value of one bill of exchange, where the index price of the shrimp exceeded the price for the bill of exchange. There's no necessary contradiction. Like my check hypothetical, if I give you a check for $500, can I come back later and say when it's time for the bank to pay the check, it was really only $300 because of our side agreement? Can I come back later and say that the amount that I will actually owe you is based on some underlying agreement? You don't really mean that, do you? The bank shouldn't pay the check according to its tenor? Well, that would be, now you're changing the hypothetical. Well, I'm asking you, if I give you a check for some certain, like these folks gave a bill of exchange into some certain, can the parties to the transaction then say we really had a side agreement that the amount of the check, the amount of the negotiable instrument, the payment amount is contradicted by a side agreement? Well, the parties would be able to introduce evidence. Parole evidence that the amount paid to the order of Mr. Thompson in X dollars is not really X dollars? It's not that the amount of the negotiable instrument is changed. It's that the obligation between the parties in Your Honor's hypothetical. Is that right? I'm not talking about the underlying obligation. That's a whole separate deal. You can sue on the consignment agreement or whatever. I'm talking about the person who winds up holding the paper. Well, under the Sachs case, which was. . . Okay, but Sachs deals with, it says parole evidence is admissible to show there was a sham transaction that was never intended to go into effect or that there was a failure of consideration. It doesn't talk about varying the specific payment term, does it? It does talk about the underlying obligation and what the purpose of the bill of exchange, or in that case the promissory note, was, what the underlying obligation. . . And it said it was admissible to show a failure of consideration. That's correct. Or that it was a sham transaction. It doesn't say anything about contradicting the specific payment term. Well, I believe the decision does talk about underlying transactions as being able to modify or even nullify the terms of the bill of exchange, or in that case the promissory note. I mean, it's important to recognize in this case that this bill of ex. . . these bills of exchange do not purport to be integrated documents in any respect. They. . . There's. . . It would be very simple for Bank of Asia to include on the bills of exchange a notation to the effect that these are integrated documents. But there is no such notation. They simply are at most one side of an agreement without any, without any. . . So much of an integrated document is if you and I have a contract to buy my car and you give me a check. I mean, it's just, it's the same sort of agreement. There was a purchase contract for this shrimp and then there were also these negotiable instruments to implement. Your Honor, if the. . . There's always an underlying transaction. Correct. That gives rise to the instrument. But the underlying transaction in this case, as in other cases, raises the question of what is the obligation. If I, if Your Honor and I are negotiating to buy a car and I write a check as a security so I can go out and test drive the car, and Your Honor were to go and simply try to cash the check, claiming that we had an agreement that I was going to purchase the car, I believe. . . You're turning a three-party into a two-party in your answer there to Judge Silverman. The side agreement here is between OM Foods and Red Chamber. But the bill of exchange is signed by Red Chamber and it, on its face, appears to be a negotiable instrument. And it says exchange for the amount of money at a 120-day site to the order of Bank of Asia. Bank of Asia is not a party to that side agreement. To get to that buy a car situation, it's like if Dad promised that he'd cover the check. It's not the responsibility or concern of whoever gets the check. But if the person who gets the check is on notice of the underlying agreement, that's where the holder-in-due-course doctrine comes in. At that point, he's not a holder-in-due-course. He's not a holder-in-due-course. However, if the agreement was not noted on the check and the check was endorsed to somebody, the endorsee might be a holder-in-due-course. He could be a holder-in-due-course. But I do want to save some time for rebuttal. But let me just say that in this case, it's undisputed that Bank of Asia knew that there was an agreement between Red Chamber and OM Foods. It knew. . . This is direct knowledge. It knew that Red Chamber was not, in fact, paying the face value of these bills of exchange for 82 of 83 transactions. It knew that there was an agreement with OM Foods, pursuant to which Red Chamber would owe a price for a shrimp that was based on the Erner-Berry Index. So we think that there's substantial evidence. . . So basically you're saying, and I think your case depends on it, that Bank of Asia had actual knowledge as well as notice that there was an agreement that made the negotiable instrument something less than it appeared to be, so it was not a holder-in-due-course. That's correct. And with the additional twist that Bank of Asia put on no evidence that its conduct in this case met the standard for commercial reasonableness, which is one of the elements of the holder-in-due-course doctrine. If there are no further questions, I'd like to reserve the rest of my time. Thank you very much. Thank you. Good morning, Your Honors. Nabil Abu-Assal on behalf of the Plaintiff and the Pelley Bank of Asia. Your Honors, Red Chamber cannot have its shrimp and eat it too. It cannot, as a matter of law, unconditionally accept a bill of exchange and then say we didn't mean it. And I'm going to get to why them signing the bill of exchange under the. . . I guess it could if Bank of Asia was not a holder-in-due-course and had actual knowledge of the side agreement between Red Chamber and OM Foods. I'm going to argue, Your Honor, no, not even in that case. And following. . . Are you conceding that Bank of Asia did have actual knowledge as well as notice? Absolutely not. I'm not conceding that. There's nothing in the evidence that says Bank of Asia had actual notice that the bill of exchange was not what it purported to be. Bank of Asia never had actual notice that Red Chamber was dishonoring the bill in any way. Bank of Asia never had any actual notice that anything other than Red Chamber unconditionally accepting the bill of exchange. My first point is that Red Chamber cannot have its shrimp and eat it too. But my second point is Red Chamber cannot speak out of both sides of its mouth. It cannot, on the one hand, assert that General Bank is our collecting bank and is our agent, and then by its own communication to General Bank, in effect, make General Bank its agent and dictate the scope of the agency. Could you talk about what your excerpt references for what we should look at and about Red Chamber's excerpt references so that we can resolve this Holder in Due Course issue? Sure, Your Honor. Okay. Number one, all of the evidence that they cited to you has nothing to do with not accepting the bill of exchange. Pages 407, 405. They don't have anything to do with that. But at best, Bank of Asia was inquiring as to when they would receive payment from Red Chamber. That's it. They weren't the only instructions that Bank of Asia gave to General Bank, and I'd like to go through the commercial code and then the actual instructions. It's so helpful to see them. Limit the information that General Bank could get and what constitutes notice to Bank of Asia as a matter of law, as a matter of law. And I'd just like to go through the commercial code for a second, okay, because this case is, unfortunately, much simpler than any of the briefs shown. Okay. The first thing is under Commercial Code 3106. 3106 defines what is an unconditional promise or order, and it's in Section A. And I'm not going to read the first part of it because that's not relevant. But it says an express condition to payment. I'm sorry. A promise or order is unconditional unless it states, one, an express condition to payment. Not here. Two, that the promise or order is subject to or governed by another writing. Not here. If you look at the bills of exchange at ER 100 to 143, there's not one alteration on them other than Red Chamber's authorized signature. Three, or that rights or obligations with respect to the promise or order are stated in another writing. Not here. Okay. There's no reference to another writing on the bill of exchange. A reference, and then it goes on because it says, a reference to another writing does not of itself make the promise or order conditional. So even if it did refer, it wouldn't make the bill of exchange conditional. Even if it did, we don't even have that here. Now, why is that so significant that this thing, this negotiable instrument that they signed is unconditional? And what does it mean in terms of summary judgment? There are the case on point in how you should analyze this is FPI versus Nakashima. That is a 1991 case that goes through all of the parole evidence and how you apply it to promissory notes. Okay? Not a bill of exchange, but similar promissory notes. And what that case concludes is where you have someone signing a promissory note or a bill of exchange and later saying, but it was conditional upon their sale of real estate. What should the court do? And the court there said, what we have here is the juxtaposition of two contradictory admissions on summary judgment. That's what we have. On the one hand, as a matter of law, you have an unconditional promise. So they admit they unconditionally did something. On the other hand, they're saying, no, we didn't mean it. Oral conversation saying that this bill of exchange was somehow altered or conditioned upon something else. And FPI versus Nakashima, which we do cite in our briefs, which falls Masterson, which falls all the cases that liberalize, make the parole evidence rule more liberal in California. It says, no, absolutely not. On a summary judgment motion where you have that type of contradiction, you're dead. Defendant is dead. They cannot raise it because they're admitting two things that don't correspond. And that should be the end of the story on the parole evidence rule. But the question that Your Honor, Ms. Silverman, asked, they have cited to not one case where the court allowed parole evidence or anything else to alter the price of a note, of a bill of exchange, of anything. Okay? They've cited to no such case. We, on the other hand, starting off with Cashman in 1891, Oakland in 1953, a Traynor case, Justice Traynor case, so crucial. And there, Justice Traynor says, ordinarily in the absence of fraud, mistake or lack or failure of consideration, a prior contemporaneous oral agreement that a promissory note is not to be payable according to its terms constitutes no defense to an action on the note. Okay? Then Masterson v. Sign kicks in. And what does Masterson v. Sign say? It says, when you look at a contract, okay, we're not going to be blinded. The court is first going to look at the totality of the circumstances and see if it should allow parole evidence in. How does it do that? Masterson actually sets up the test. Okay? And it says, you look to see whether the parole evidence that is being asserted is credible. How do you decide whether it's credible or not? You ask yourself, in the ordinary course of business for that contract, would the parties have been, and this is my word, insane not to include it in the agreement? Or would they have been unreasonable not to include it in the agreement? If that's the case, they should have included it in the agreement. Okay? Here we have a party signing a bill of exchange. It is presumed to know that it is a negotiable instrument that is giving notice to the world that it's money. Money. You can pass it around as if it were cash. Okay? And now it's telling you, no, this amount on the bill of exchange was really subject to some oral consignment agreement that they can't even tell you the date of. They can't tell you the exact date of that oral consignment agreement or all of its terms. That's what they're telling you. And Masterson says, on that prong alone, you should exclude it based upon the parole evidence. Masterson goes on to say, if a jury would be confused by the juxtaposition of the alleged oral agreement, as opposed to the written agreement, you should exclude it. And in this case, if the judge, as a matter of law, included the alleged oral agreement, he's placing it on equal footing with a bill of exchange that was not only signed by Red Chamber, but was signed by Red Chamber and given to General Bank, okay, collecting it for all foods, and Bank of Asia. So it knew, it knew that third parties were relying on the unconditionality of this. Could you talk a little more about the facts? Your argument is premised on the proposition that Bank of Asia does not have knowledge that the bill of exchange is intended by all parties to be subject to the consignment agreement. Right. And Red Chamber says, that's not so. There's a genuine issue of fact about whether Bank of Asia knew that it was subject to the consignment agreement. They knew that they were getting part of the money from OM Foods and not from Red Chamber, and they knew enough to know that Red Chamber was never paying the full amount, even if they didn't know all of the terms. Focus a little more on the facts, and it would be helpful to me. What did Bank of Asia know? What it knew was. Any time you can refer to excerpts. I will. At best, this is what Bank of Asia knew, assuming all of their facts, okay? I'm just going to get to the heart of it, and then I'm going to back up and talk about limited agency and why whatever was said to General Bank shouldn't be impeded to us. But for purposes of your argument, Your Honor, I'm going to go there. A lot of your argument is on the easy stuff instead of the hard stuff. I'm going to get to the hard stuff. If they told, what did they tell General Bank, and let's assume it was impeded to us, at best, okay? They told them orally sometime in 2000, we don't even know the exact date, whether it was before they started writing the bills of exchange or after. We don't know. Okay, sometime in 2000, they told General Bank, you know what? We have this consignment agreement, and as to all our foods, okay, between us and them, we don't have to pay the face value of the bills of exchange. We only have to pay the amount we receive for the sale of shrimp, the market price, okay? Thereafter, they started signing 127 bills of exchange. The bills of exchange at issue here were signed in mid-2000 and then, I'm sorry, mid-2001 and 2002, a year after they purportedly had this oral consignment agreement. And when they signed it, they did not alter it in any way, which is the only way that you can change a bill of exchange under the commercial code. And I'm sure my colleague is going to speak to you about that, okay? So what is it that Bank of Asia knew on those facts? What it knew was, is notwithstanding the consignment agreement, they were still making unconditional promises in writing. That's what they knew. And that's my argument, is that, and how do we know that? Let me tell you how we know that. From Red Chamber's own mouth, their own admissions in the evidence. I quote from page 8 of Red Chamber's opening brief, where they cite to ER 267 and 508 to 510. This is in their response to the rhetorical question, why would you sign the bills of exchange if you knew you had a consignment agreement with OM Foods? Why would you do it? Answer. This is a quote. Each bill of exchange that Red Chamber signed, and here are the key words, in order to receive a particular shipment of shrimp, directed Red Chamber to remit payment to OM Foods' bank, Bank of Asia. That's their own quote. What page was that again? Page 8 of Red Chamber's opening brief. And they cite to their own evidence 267, 508 to 510. They're basically saying, yes, we knew about the consignment agreement, but we had to get the shrimp. And the only way we could get the shrimp was to sign unconditionally, without alteration, the bill of exchange. But it's even more than that. Look at page 7 of Red Chamber's opening brief, and I quote, in order to secure payment of the proceeds of Red Chamber's sale of the shrimp, Red Chamber executed a bill of exchange corresponding to each shipment of shrimp. Wait a minute. You're not quoting the record. You're quoting the brief. Is that right? The first time is their quote from the brief to the record. It's both. The second time is from their brief. Okay? The second time is from their brief. So when a person knows, I've got this consignment agreement, but I've got to get the shrimp, and in order to get the shrimp, I've got to represent to General Bank and Bank of Asia my unconditional acceptance, the only rational explanation for that is they're doing it notwithstanding the consignment agreement, not subject to. Subject to would mean that they would alter the bill of exchange. Now, I want to briefly address. Did you want to leave five minutes, or are there four left? It's okay. For General? No, I don't. I want to address my point, which is limited agency. You're talking about your colleague here. You're going to. Yeah. Oh, my colleague? Yeah.  I want to make one last point, Your Honor. Well, it's up to General. I'm spending all this time. It's not up to you. It's up to General. We'll hear from General. The points are in the briefs. I will cede another minute to a minute and a half. All right. Great. Go ahead. One last point, Your Honor, on the point that they can't make us, they can't make General Bank or Asia and then try to not make us limit the scope of their agency. We get to do that under the commercial code and all of the cases, including Summers, the Fifth Circuit case. The collection instructions are at ER 145 to 188. I have copies of them here if you would like to look at them. Can I get them to you? Not necessarily. You've got the record. On those collection instructions are 15 boxes that Bank of Asia could choose from to instruct General Bank. It only checked off four, okay? And those four specifically say, basically, look at the bill of exchange, make sure it's signed, remit payment to us. There's a box that they do not check. It says, advise noncompliance of other instructions detailed below by telex, aerial telecommunications. And then it has other instructions. And guess what? It's left. Which box? I'm looking at the thing. It's the last box. Look at the last box. Oh, not checked. Not checked. It's totally blank. If we wanted General Bank to give us notice of something other than the mere fact they signed the bill of exchange, as is, we could have said so. Thank you, counsel. Again, Your Honor, Thomas M. Robbins, appearing for, I'll call to say, at General Bank. I would like to first address something that the appellant's counsel stated, which was that there was some direction from Bank of Asia that directed General Bank to make inquiries and to, you know, follow up on things. Since that was not part of Bank of Asia's appeal against us, I can't cite the court to the record, but I think if the court looks at the evidence, those instructions and those requests came well after the fact. As counsel for Bank of Asia just indicated, if one looks at the instructions that were sent with the collection, it says nothing about that. And so I would urge the court to look very closely at the representation that there was some direction from Bank of America that we were supposed to follow up, because I believe that they will concede to the court that that came well after the fact and well down the line. Did you get $1,800 in collection fees for each collection or $1,800 in collection fees for the whole series of bills of exchange? The whole series, Your Honor. $1,800. I mean, if one looks at the percentages, it's of the amount that was uncollected, we got .03-something percent. So this is more like a bank that gets $10 for processing some odd instrument. Sure. And if Bank of Asia wants to buy credit insurance, let them go out and buy insurance. If Red Chamber wants to make sure everybody knows what's going on with the deal, have them make sure up front. Going to the Bank of Asia appeal against us, I just have three points, Your Honor. First of all, there was no evidence in the record in opposition to my summary judgment motion that there was any duty on our part to disclose this alleged statements by Red Chamber to my clients, which occurred, as the evidence will show, or as the evidence will show, those statements were back in December of 2000. These transactions that issued today are starting July 2001 and go into February 2002. Secondly, Bank of Asia did not offer any evidence in opposition to our summary judgment motion that General Bank knew or had reason to know that Bank of Asia didn't know the deal or didn't know that there was this, that there was, you know, these arrangements that are not part of the norm. And if I could invite the Court's attention to Bank of Asia's reply brief to my answer at page 23 to 24, that Bank of Asia discusses those 83, those prior 83 deals. And Bank of Asia admits that it knew, yeah, it was getting paid sometimes from the bills of exchange, and sometimes its own customer paid them and then went and collected from Red Chamber. So how, with these 83 transactions, how is my client supposed to reasonably know that they have not, that they did not know of this arrangement themselves? Nor did Bank of Asia offer in opposition to my summary judgment motion that it did not, in fact, know. Now, in Bank of Asia's reply brief, they cite. Are you putting at issue whether Bank of Asia is a holder in due course? Your Honor, I'm, I've fully, let me put it this way. I fully believe that Bank of Asia is a holder in due course in this case. However, is, is Bank of Asia is, is cross-appealing against my client, saying that if this Court does not find that to be the case, it ipso facto has to reverse as to my summary judgment. And I'm trying to explain to the Court why that's not true. Because given the evidentiary record on my summary judgment motion, Bank of Asia did not put in evidence that it did not know. It did not put in evidence that anything that we had no, that we had no reason to know. I thought, I thought all you needed was, we don't care if they're a holder in due course or not. That's between them and Red Chamber. All we are is a collection agent. They pay us the nominal fee, and we send them whatever money Red Chamber pays us, and we've discharged our duty. That's true. I thought that was the case. That is true. That is true. Is that, is it more complicated than that? I don't think so, Your Honor. But unfortunately, I don't have the benefit of the Court's, what the Court's thinking. All I'm trying to do is respond to Red Chamber's argument that, that there would be some logical inconsistency. I mean, if the Court, if the Court is of the belief that it doesn't make any differences to my liability, whether or not Bank of Asia is a holder in due course, then that, that does close the book on it. If all you are is a collection agent, it doesn't, right? Correct. It doesn't make, it doesn't make any difference. You have that broader agency responsibilities for it to matter. I'm sorry, Your Honor? And you're, so what your argument now is, even if our agency responsibilities are broader, and we did have a duty to tell them, we wouldn't be telling them anything they didn't already know. Not necessarily, no, Your Honor. My, my point that I'm making is this. If the Court believes it does make a difference, whether they are a holder in due course, I'm trying to point out to the Court the evidence that they raised in opposition to my motion for summary judgment was still insufficient as a matter of law to create some other duty on us, be, you know, I mean, everybody admits that the instructions do not create the duty. And Bank of Asia, in its reply brief, argues that it did put into the record deposition testimony. That is not the case. We put into the record, in our own supplemental record, General Banks, the separate, or the separate statement of uncontroverted facts and supporting evidence that Bank of Asia filed. And if one looks at pages 60 to 66, that is their statement of genuine issues. And in their reply brief, they cite to a deposition testimony, which is not the case. It's just simply not cited in their opposition in the Court below. Thank you, Counsel. Thank you. Just a few words in reply, Your Honor. First of all, we, it's important to remember that before any of the controversy here arose, Red Chamber, Bank of Asia, and OM Foods acted in conformance with the consignment agreement 83 times. That's a significant course of performance here, which under the UCC is admissible to demonstrate the understanding of the parties of the contract. As for the limited agency, it's important to remember that Bank of Asia sued General Bank as its agent, as its fiduciary, claiming that it breached its fiduciary duties by not telling them, among other things, about the consignment agreement. The Bank of Asia specifically pleaded as the collecting bank for Plaintiff Bank of Asia, defendant General Bank owed Plaintiff Bank of Asia a duty of care. It's not the case that the specific boxes checked on the form necessarily delimit completely the... Why would we care what they said in a complaint? There's no judicial estoppel unless and until they've succeeded and recovered on an allegation. Because this is summary judgment. And as the nonmoving party on an issue... A complaint is not one of the 56C and 56E documents that establishes a fact. Well, indeed, the court's own findings of fact, which were submitted by, which were drafted by Bank of Asia and then approved by the court, contain analogous findings of agency. So that's the reason I think that these pleadings are important, because they... And Bank of Asia is entitled to argue against it, but that's what a trial on the merits is, and that's not what summary judgment is for. I don't get it. If the complaint says there's an averment in paragraph 18 of the complaint and then paragraph 18 of the answer admits the averment in paragraph 18 of the complaint, then you've got a fact established by the pleadings for purposes of summary judgment. Or if the parties stipulate to uncontroverted facts, then you have a fact established for purposes of summary judgment. But I don't understand what you're saying about this case. What I'm saying, perhaps inartfully, is that by affirmatively pleading that General Bank was Bank of Asia's agent and that the duties that it did not discharge according to the allegations of the complaint, including the duty to act reasonably and with due care, that that is something that we contend that Red Chamber is answerable to, that we're not contending that this establishes the fact as something that they're not entitled to controvert with evidence at trial, but that we're entitled to point to that as evidence of what their understanding of General Bank's responsibilities were. That's all I'm trying to say, Your Honor. I've exceeded my time. If you have any questions, I'll be happy to answer them. Thank you very much. Thank you, Your Honor. I appreciate the interesting case you've given us.
judges: Lay, Kleinfeld, Silverman